[Cite as *Dalrymple v. Westerville*, 2022-Ohio-4094.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Bonnie Dalrymple, | : | |
| Plaintiff-Appellant, | : | No. 21AP-514 |
| | | (C.P.C. No. 18CV-1789) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| City of Westerville et al., | : | |
| Defendants-Appellees. | : | |

---

D E C I S I O N

Rendered on November 17, 2022

---

**On brief**: *Moore and Yaklevich*, and *W. Jeffrey Moore*; *Eric R. Nordman*, for appellant.

**On brief**: *Isaac Wiles & Burkholder LLC*, and *Aaron M. Glasgow*, for appellees.

---

APPEAL from the Franklin County Court of Common Pleas

McGRATH, J.

{¶ 1} This is an appeal by plaintiff-appellant, Bonnie Dalrymple, from a judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendants-appellees, City of Westerville (individually "the city"), Bassem Bitar, Ed Ungar, Bryan Wagner, David Hays, Karl Craven, Westerville Industry and Commerce Corporation ("WICC"), and Uptown Improvement Program/Uptown Review Board ("URB").

{¶ 2} The following background facts are taken primarily from the decision of the trial court ruling on appellees' motion for summary judgment. Appellee Bassem Bitar (individually "Bitar") is the planning manager for the city; he manages the city's "involvement with private development activity," and his duties include "overseeing staff

input to the Planning Commission, Board of Zoning, Uptown Review Board, as well as communications to City Council." (Decision at 1.) One aspect of Bitar's position involves "speaking with persons and businesses considering buying property in Westerville and/or starting a business in Westerville about land use, zoning and development issues," including "discussing the viability of potential uses and potential funding opportunities for development." (Decision at 2.)

{¶ 3} Appellee Bryan Wagner (individually "Wagner") is the enforcement officer for the city, whose duties are to "enforce the City's Zoning Ordinance, Property Maintenance Ordinance, Yard Care Ordinance and other City ordinances as assigned." Appellee Ed Ungar (individually "Ungar") is the city's chief building official, and his duties "are to oversee the daily activities of the building department, including the enforcement of the Ohio Building Code and Residential Code of Ohio." Appellee David Hays (individually "Hays") is a zoning enforcement officer for the city; his duties include "the enforcement of the City's Property Maintenance and Zoning codes." Appellee Karl Craven (individually "Craven") is the city's planning and development director, whose duties include "the administration of Planning and Development Department, management of personnel, budget issues and management of capital improvement projects." (Decision at 2.)

{¶ 4} Appellee WICC is a "501(C)(3) non-profit corporation * * * formed to support economic development within the City and has seven members, which include the City Administrator, the City Attorney, the Mayor, the Director of Planning and Development, and three private citizens with connections to the City's business community." (Decision at 2-3.) One function of WICC is to "administer a grant funding program which provides funds to uptown business[es] for renovations." (Decision at 3.)

{¶ 5} Procedurally, in order to secure funding from WICC to renovate a commercial property, "property owners initially apply to WICC for preliminary approval." If a project meets the program guidelines, "WICC conditionally approves their application," and the property owner "must then have their individual plans approved by the Uptown Review Board * * *, a citizen board which reviews proposed alterations to uptown properties." If the URB "approves the plans, and if the property owner completes the buildout of the renovations consistent with the approval from the URB, [then] the property owner provides verifying evidence of the expenses for the project to development staff." If the renovations

and documentation of expenses are accurate, WICC "releases funds to reimburse the property owner's expenses in the previously agreed to amount." (Decision at 3.)

{¶ 6}  Appellant first contacted the city "in October 2015 regarding the potential purchase of investment property" within the city. After looking at several different properties in the area, she "eventually focused her attention on the property at 30 E. College Ave., which is located within the Uptown zoning district," a historical district in the city "with added review required for architectural changes to the exterior of properties." (Decision at 3.)

{¶ 7}  The property at 30 E. College Avenue was "originally a single-family home which had been converted to a commercial building, most recently being used for a flower shop." When appellant inquired about the property, Wagner "provided her with information regarding the status of the enforcement action against the prior owner for code violations." (Decision at 3.) Wagner and Bitar provided appellant information "regarding the grant funding program," and Wagner e-mailed appellant a link to a website with "program guidelines containing full information on the program." According to the guidelines, "WICC grant funding is available *only for commercial and mixed-use properties, not for residential uses*." (Emphasis sic.)   Bitar also told appellant that "WICC funding might be available for her intended renovations if they were for a *commercial* use and encouraged her to review the program criteria." (Emphasis sic.)  Neither Bitar nor Wagner "made any representations about what the building code requirements would be for a commercial use," although Bitar "encouraged [appellant] to check with the Chief Building Officer regarding how the applicable building code requirements might affect the use of the [p]roperty." (Decision at 4.)

{¶ 8}  Appellant closed on the property on December 23, 2015; the purchase price was $131,000.  Appellant "did not speak to" Ungar, Hays or Craven about the property "prior to closing." Following the purchase of the property, appellant "worked with City staff to apply to WICC for funding." On January 5, 2016, Bitar provided appellant "with a roadmap for the approval process and the necessary forms to apply for funding." (Decision at 4.)  Bitar also connected appellant with David Meadows, "an official with the City's Economic Development Department." (Decision at 4-5.) On February 3, 2016, Bitar "followed up" to provide appellant with "detailed information about how to apply for WICC

funding."  (Decision at 5.) Over the course of the next month, Bitar and appellant "continued to discuss the WICC funding process."  During the first week of March 2016, appellant asked Bitar if she would be eligible for WICC funding "if a portion" of the property would be used for commercial purposes.  On March 8, 2016, Bitar "confirmed WICC would likely approve funding for the whole renovation even if only a portion of the home would be used commercially." (Decision at 5.)

{¶ 9}   On March 16, 2016, appellant filed her application for WICC funding.  In her application, she "represented the renovation would be for a '*commercial space*.' " (Emphasis sic.)  Appellant "also agreed to be bound by the terms of the WICC funding program and she would comply with the applicable building code when completing the renovations." (Decision at 5.)

{¶ 10} On March 21, 2016, WICC "conditionally approved every request" appellant made and "set aside $27,053" for appellant's project.  In its letter notifying appellant of the approval, "WICC indicated the next step was to have her plans approved by the URB." WICC also "expressly indicated as a condition of the award of funding" that appellant "would need to agree not to convert the [p]roperty into a high-density residential use, a condition which would be reduced to writing." (Decision at 5.)

{¶ 11} On April 7, 2016, the URB "approved all ten" of appellant's "applications for Certificates of Appropriateness for the various improvements proposed for the [p]roperty." This approval "cleared the way" for appellant "to move ahead with her renovations of the [p]roperty." (Decision at 5.)  In order to obtain the WICC grant funds, appellant "would have needed only to complete the renovations on her [p]roperty consistent with the approval from the URB, as well as the grant criteria which require compliance with all City codes and give WICC discretion to set certain conditions." (Decision at 5-6.)

{¶ 12} Following the approval, however, appellant "began to express concerns about the requirements necessary to secure WICC funding."  More specifically, issues arose when Ungar "explained to [appellant] that if she intended to use the [p]roperty as a mixed use with some commercial component, the commercial portion of the building would need to meet the standards in the commercial building code," which would "require hiring a professional to determine whether the building currently met the commercial Building

Code requirements and, if not, what upgrades would be necessary to meet those standards." (Decision at 6.)

{¶ 13} On July 11, 2016, David Meadows, the city's economic development director, contacted appellant to "discuss her concerns." On August 5, 2016, city staff members, including Meadows, Bitar, and the city attorney, met with appellant. Following that meeting, Meadows sent appellant a letter "explaining her options for the [p]roperty relative to WICC funding and the various uses she was considering." Meadows "reiterated that WICC funds could only be used for *commercial* uses and funding would be conditioned on her agreement that the [p]roperty could *not* be used for a multifamily use for five years (which was consistent with the approval letter sent months earlier)." (Emphasis sic.) (Decision at 6.)

{¶ 14} Meadows outlined the following three options for appellant: (1) complete the project "as presented to WICC and the URB," whereby the project "would be eligible for reimbursement through WICC, but [appellant] would have to comply with the Ohio Building Code, which included the requirement to submit a plan from a licensed design professional for the commercial space"; (2) maintain the use "solely as commercial/office," whereby the project would be "eligible for reimbursement through WICC and would be largely 'grandfathered' as to compliance with" the Ohio Building Code, but appellant "would not be able to maintain any residential use on the [p]roperty"; (3) convert the project to "a residential use, with no commercial component," which would not subject the project to "the Ohio Building Code requirements for commercial uses or any other condition imposed by WICC, but the project would also not be eligible for reimbursement through WICC." (Decision at 6-7.)

{¶ 15} Appellant was "unwilling to agree to the limitations on the use of her [p]roperty or engage a licensed design professional to bring the [p]roperty into compliance with Ohio Building Code." As a result, she "did not move forward with the process to obtain WICC funds." (Decision at 7.)

{¶ 16} In 2016, appellant "began the process of marketing and selling" the property, and she engaged the services of Amy Clark, a real estate broker with the "Clark Realty Group." Agents listed the property for sale, and a local church purchased the property for

$400,000. According to figures submitted by appellant, "she made a profit of $78,254.26 over the amount for which she bought the house and the renovation costs." (Decision at 7.)

{¶ 17} While the property was being marketed, appellant's real estate agents discussed the property with city staff, including Bitar, "several times." (Decision at 7.) Bitar informed the agents "there were restrictions on the uses to which the [p]roperty could be put if the [p]roperty owner wanted to obtain funds from WICC." (Decision at 8.)

{¶ 18} On March 22, 2017, approximately one month after selling the property at 30 E. College Avenue, appellant purchased the property at 27 E. College Avenue. She sold this property "the next year for $470,000, $115,000 more than she bought it for." (Decision at 8.)

{¶ 19} Appellant "has been a licensed real estate broker since 2006," and she "brokered the sale and lease of residential and commercial property in Colorado until she moved to Ohio." She "also completed at least three renovation projects—or 'flips'—prior to the one at issue here." (Decision at 8.)

{¶ 20} On February 27, 2018, appellant filed a complaint, naming as defendants the city, Bitar, Ungar, Wagner, Hays, and Craven. The complaint alleged that the property at 30 E. College Avenue was "zoned mixed use," and that appellees "knew" that appellant's "main purpose was to live in it and conduct business from it." (Compl. at ¶ 10.) The complaint alleged that, prior to purchasing the property, appellees "assured/promised" appellant "that historical restoration funds would be available to her should they be needed to help pay for the rehab of the home in question." (Compl. at ¶ 11.)

{¶ 21} According to the complaint, once appellant "had extensively beg[u]n the rehabilitation work the [appellees] started harassing and citing [appellant] for work done and not done, advising her that new contingencies and code requirements existed, completely ignoring their previous promises and representations." (Compl. at ¶ 13.) Appellant alleged that the actions of appellees forced her to sell the property, and that appellees "falsely stated and represented to real estate agents for potential buyers and/or potential buyers that the deed and use were restricted, thereby interfering with her sale to certain purchasers and causing potential buyers to either withdraw their purchase offers and/or fail to offer to purchase the property." (Compl. at ¶ 19.)

{¶ 22} On June 25, 2018, appellant filed a motion for leave to file an amended complaint, seeking to add as defendants WICC and "Uptown Improvement Program." The amended complaint alleged causes of action for fraud, fraud in the inducement, misrepresentation, breach of promissory estoppel, tortious interference with a business relationship, and intentional infliction of emotional distress.

{¶ 23} On June 26, 2019, the city, Bitar, Ungar, Wagner, Hays, Craven, WICC, and URB (collectively "appellees") filed a motion for summary judgment. In the accompanying memorandum in support, appellees asserted the city, WICC, and URB were immune from liability under R.C. 2744.02(A), and that the individual appellees were immune from liability under R.C. 2744.03(A)(6). On November 7, 2019, appellant filed a memorandum contra appellees' motion for summary judgment.

{¶ 24} On September 8, 2021, the trial court filed a decision and entry granting summary judgment in favor of appellees. In its decision, the court held that appellees were entitled to political subdivision immunity under R.C. 2744.02 and 2744.03, and that appellant failed to establish a genuine issue of material fact as to her claims for fraud/fraud in the inducement, promissory estoppel, tortuous interference with a business relationship, and intentional infliction of emotional distress.

{¶ 25} On appeal, appellant sets forth the following eight assignments of error for this court's review:

> [I.] The Trial Court erred when it Granted Defendants'-Appellees Summary Judgment pursuant to Ohio Rule of Civil Procedure 56.
>
> [II.] The Trial Court erred when it ruled that the City of Westerville was entitled to governmental immunity under ORC 2744.02(A).
>
> [III.] The Trial Court erred when it ruled that Bitar and Ung[a]r are entitled to governmental immunity under ORC 2744.03(A).
>
> [IV.] The Trial Court erred when it ruled that WICC and URB have governmental immunity under ORC 2744.02(A), as "Instrumentalities" of a Political Subdivision.
>
> [V.] The Trial Court erred when it ruled that Appellant failed to produce sufficient evidence of fraud/fraud in the inducement and damages.

[VI.] The Trial Court erred when it dismissed Appellant's promissory estoppel action.

[VII.] The Trial Court erred when it ruled that Appellant failed to produce sufficient evidence of tortuous interference with a business relationship and damages.

[VIII.] The Trial Court erred when it ruled that Appellant failed to produce sufficient evidence of intentional infliction of emotional distress and damages.

{¶ 26} Appellant's assignments of error, each challenging the propriety of the trial court's grant of summary judgment in favor of appellees, will be consolidated for purposes of review. Under these assignments of error, appellant asserts the court erred in: (1) determining the city was entitled to governmental immunity under R.C. 2744.02(A); (2) holding that URB and WICC were entitled to governmental immunity under R.C. 2744.02(A) as instrumentalities of a political subdivision; (3) ruling that city employees Bitar and Ungar were entitled to governmental immunity under R.C. 2744.03(A); (4) finding appellant failed to produce sufficient evidence as to the elements of her claims of fraud, fraud in the inducement, tortuous interference with a business relationship, and intentional infliction of emotional distress to withstand summary judgment; and (5) dismissing her promissory estoppel action.

{¶ 27} In accordance with the provisions of Civ.R. 56(C), "summary judgment shall be granted when the filings in the action, including depositions and affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 24. This court's review of a trial court's decision on summary judgment is "de novo." *Id.*

{¶ 28} Under Ohio law, "[a] claim of sovereign immunity by a political subdivision requires the three-tiered analysis provided in R.C. Chapter 2744." *Baker v. Wayne Cty.*, 147 Ohio St.3d 51, 2016-Ohio-1566, ¶ 11, citing *Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 118 Ohio St.3d 392, 2008-Ohio-2567, ¶ 16. Under the "first tier" of this analysis, "a political subdivision has immunity for negligent acts as long as the negligent acts are in connection with governmental or proprietary functions." *Id.*, citing R.C. 2744.02(A)(1); *Rankin* at ¶ 17. The "second tier" of the analysis requires an examination as

to "whether any of the five exceptions listed in R.C. 2744.02(B) apply." *Id.*, citing *Rankin* at ¶ 18. If any exception under R.C. 2744.02(B) does apply, "the third tier of the analysis considers whether sovereign immunity can be reinstated by one of the statutorily listed defenses." *Id.*, citing *Rankin* at ¶ 27.

{¶ 29} Appellant initially contends the trial court erred in granting summary judgment in favor of the city. Specifically, appellant argues the trial court erred in finding the city was immune because it engaged in the governmental function of enforcement of its zoning laws. According to appellant, when a city gives a private citizen money or a benefit that is not for the public good, it is engaged in a proprietary, not a governmental, function. In asserting the city was engaged in a proprietary function, appellant seeks to rely on one of the exceptions to the general grant of immunity, R.C. 2744.02(B)(2),[1] which imposes liability on a political subdivision for an employee's negligent performance of a proprietary function.

{¶ 30} R.C. 2744.01(C)(1) "provides a generic description of governmental functions." *Greenfield v. Schluep*, 4th Dist. No. 05CA8, 2006-Ohio-531, ¶ 12. R.C. 2744.01(C)(1) states as follows:

> "Governmental function" means a function of a political subdivision that is specified in division (C)(2) of this section or that satisfies any of the following:
>
> (a) A function that is imposed upon the state as an obligation of sovereignty and that is performed by a political subdivision voluntarily or pursuant to legislative requirement;
>
> (b) A function that is for the common good of all citizens of the state;
>
> (c) A function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons; and that is not specified in division (G)(2) of this section as a proprietary function.

---

[1] R.C. 2744.02(B)(2) states: "Except as otherwise provided in sections 3314.07 and 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions."

{¶ 31} In addition to the above "general definition, the statute also provides a nonexclusive list of items that are deemed governmental functions per se." *Schluep* at ¶ 12. As relevant to the instant action, R.C. 2744.01(C)(2)(p) states in part that "[t]he provision or nonprovision of inspection services of all types, including, but not limited to, inspections in connection with building, zoning, sanitation, fire, plumbing, and electrical codes, and the taking of actions in connection with those types of codes" is a "government function."

{¶ 32} By contrast, "R.C. 2744.01(G)(1) defines 'proprietary function,' in relevant part, as 'a function of a political subdivision that is specified in division (G)(2) of this section' or one that satisfies both of the following: (1) 'The function is * * * not one specified in division (C)(2) of this section,' and (2) 'The function is one that promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons.' " *CR Hill, L.L.C. v. Westlake*, 8th Dist. No. 110610, 2022-Ohio-693, ¶ 15, quoting R.C. 2744.01(G)(1)(a) and (b).

{¶ 33} In the present case, there is no dispute the city is a political subdivision as defined in R.C. 2744.01(F). As noted, however, appellant argues the city engaged in a proprietary function by "[p]romising free grant money to a private citizen to fix a privately owned building with mixed use zoning and then requiring her to change her home's zoning status." (Appellant's Am. Brief at 30.) Upon review, we find unpersuasive appellant's contention that the trial court erred in failing to find the activity at issue involved a proprietary function.

{¶ 34} In determining whether a political subdivision is engaged in a governmental or proprietary function under R.C. 2744.01, "a court should look to the particular activity the subdivision is engaged in and decide whether that particular activity is of the type customarily engaged in by nongovernmental persons." *Schluep* at ¶ 13. In this respect, "the central issue resolves to whether the *action* for which [the plaintiff] seeks to hold the city liable is part of a governmental function or part of a proprietary function." (Emphasis sic.) *Scott v. Columbus Dept. of Pub. Utils.*, 192 Ohio App.3d 465, 2011-Ohio-677, ¶ 11 (10th Dist.). Further, "an activity that is customarily performed by nongovernmental persons does not render proprietary an overarching function that is governmental." *McDonald v. Lacy*, 2d Dist. No. 27779, 2018-Ohio-2753, ¶ 18, citing *Shank v. Springfield*, 2d Dist. No. 94-CA-71 (May 3, 1995).

{¶ 35} While appellant frames the dispositive issue as whether a city's promise of grant funding involves a governmental or proprietary function, the broader issue, for purposes of examining the conduct at issue (as reflected in appellant's complaint and deposition testimony), involves her claim that she was denied such grant money because of requirements by the city as to zoning and building code requirements pertaining to renovations made to her property located in the Uptown District. In her amended complaint, appellant alleged that "[t]he historical district of Old Westerville is controlled in matters of restoration, zoning, improvements and preservation by [appellee] the Uptown Review Board which is sanctioned by the City to police and maintain certain zoning requirements for the area as well as sanction and approve citizens and/or companies for historical restoration funds." (Pl.'s Proposed Am. Compl. at ¶ 11.) Further, prior to purchasing the property at 30 E. College Avenue, she consulted with a city employee (Bitar) about operating her real estate business out of the property, and also expressed her desire to reside at the property and to maintain a separate room for her mother. Appellant alleged she was assured she would "receive the funding necessary to rehabilitate and restore the property if she needed it." (Pl.'s Proposed Am. Compl. at ¶ 15.)

{¶ 36} However, once she began rehabilitation work on the property, appellees "started harassing and citing [her] for work done and not done, advising her that new contingencies and code requirements existed." (Pl.'s Proposed Am. Compl. at ¶ 16.) Appellant further alleged that, at the time she applied for "the promised financial aid for the rehabilitation of the property," appellees "told her she could only get the money if she agreed to change the zoning of her property from mixed use to a restricted use and/or restricted deed." (Pl.'s Proposed Am. Compl. at ¶ 17.) According to appellant, she "refused to agree to the new rezoning/use contingencies," and was "forced to sell" the property because it "no longer fit her use and because she had spent all of her money bringing her historical property up to new code and the historical rehabilitation standards." (Pl.'s Proposed Am. Compl. at ¶ 19, 21.)

{¶ 37} The trial court, in addressing and rejecting appellant's claim that the city engaged in a proprietary function, found the activity at issue involved the city's enforcement of its zoning laws, i.e., that the city's conduct in providing advice to appellant about building and zoning code requirements for renovations in the city's historic Uptown District (albeit

in the context of applying/qualifying for grant program funding) involved a governmental function. In support, the trial court relied on Ohio case law holding that a political subdivision's enforcement of its zoning laws constitutes a governmental function. *See, e.g.*, *CR Hill* at ¶ 16 ("[a]ctions a city takes in connection with its zoning code constitute a governmental function"); *Brewer v. Butler Cty. Bldg. & Zoning Dept.*, 142 Ohio App.3d 567, 574 (12th Dist.2001) (department engaged in governmental function when it refused to issue building permit due to the appellant's failure to comply with requirements of county's building code).

{¶ 38} Based on this court's de novo review, we agree with the trial court's determination that the city was engaged in a governmental function when providing advice to appellant on compliance with building and zoning code issues, i.e., that the conduct at issue involved the "taking of actions in connection with" building and zoning codes. R.C. 2744.01(C)(2)(p). Here, the issue of grant funds cannot be divorced from the fact that program funding (provided under the city's Facade Improvement Program and earmarked for improvements made to buildings in the city's historic district) was contingent upon an applicant's compliance with applicable building and zoning code requirements (including agreement to building inspections). Those requirements are set forth in the grant guidelines, which state in part: "The owner/tenant shall comply with all applicable provisions of the Westerville Codified Ordinances and Ohio Building Code. By submitting an application to the program, the tenant/property owner agrees to allow the City to inspect the interior and exterior of the building for code compliance." (2016 Uptown Westerville Facade Improvement Program Guidelines at 3.)

{¶ 39} We further agree with the trial court's determination that none of the exceptions to immunity under R.C. 2744.02(B), including 2744.02(B)(2), apply to deprive the city of immunity in this action. While R.C. 2744.02(B)(2) "is the only exception which contemplates negligent performance of acts or omissions," that provision "only applies to the performance of proprietary functions under R.C. 2744.01(G)(1)." *Padula v. Hall*, 7th Dist. No. 03-MA-235, 2004-Ohio-4823, ¶ 18. *See also CR Hill* at ¶ 21 (as city's review of development plan implicates a governmental function, "R.C. 2744.02(B)(2) does not apply because it is limited to negligence in the execution of proprietary functions"). Accordingly,

the trial court did not err in its determination the city was entitled to political subdivision immunity under the statute.

{¶ 40} Appellant also challenges the trial court's determination that both the URB and WICC were entitled to immunity, pursuant to R.C. 2744.02(A), as instrumentalities through which the city carried out its governmental functions. Appellant argues the URB and WICC are not entitled to governmental immunity under the holding in *Trucco Constr. Co. v. Fremont*, 6th Dist. No. S-12-007, 2013-Ohio-415 (concluding that a corporation and its engineers did not qualify as employees/agents of city for purposes of immunity under R.C. 2744.01(B)).

{¶ 41} The evidence submitted on summary judgment indicates WICC is a community improvement corporation ("CIC") as defined under R.C. Chapter 1724. In accordance with R.C. 1724.01(B)(1), a CIC may be organized for the purposes of "[a]dvancing, encouraging, and promoting the industrial, economic, commercial, and civic development of a community or area."

{¶ 42} Bitar, the city's planning manager, stated in his deposition testimony that WICC is an "agency that does economic development functions in association with the city." (Bitar Depo. at 11.) WICC performs "multiple functions that promote[] economic development within the city," including "the Facade Improvement Program," with the intent "to promote investment in the Uptown District." (Bitar Depo. at 12-13.) According to Bitar, WICC receives funding from city council for its grant program.

{¶ 43} Craven, the city's planning director, stated in an affidavit that WICC is a non-profit corporation "formed to support economic development within the City and has seven members, which include the City Administrator, the City Attorney, the Mayor, the director of Planning and Development, and three private citizens with connections to the City's business community." One of the functions of WICC "is to administer a program which provides funds to uptown business[es] for renovations." (Craven Aff. at ¶ 5.)

{¶ 44} In his affidavit, Craven further averred in part:

> In my position as Planning and Development Director, I am one of the City representatives on the WICC Board. The Board reviews and acts on all applications for WICC funding. For property owners seeking funding from WICC for a renovation project, property owners initially apply to WICC. If the project meets the program guidelines, WICC conditionally approves

their application. The property owner must then have their individual plans approved by the Uptown Review Board ("URB"), a citizen board that reviews proposed alterations to uptown properties. If the URB approves the plans, and if the property owner completes the build out of the renovations consistent with the approval from the URB, the property owner submits * * * verifying evidence of the expenses for the project to development staff. If the renovations and documentation of expenses are accurate, WICC then releases funds to reimburse the property owner's expenses in the previously agreed to amount.

* * *

WICC funding is available for commercial and mixed uses with a commercial component. When a property is built out for a commercial use, that portion of the property must meet the commercial building code. WICC funds are contingent on building code approval. Thus, if a property owner is not willing to comply with the commercial building code, the project will not be eligible for WICC funding. As the administrator of the grant funds, WICC has the authority to attach reasonable conditions to grant money to ensure that it will be used for the purposes of the program, which is the development of commercial property.

(Craven Aff. at ¶ 8, 10.)

{¶ 45} With respect to the URB, the evidence on summary judgment indicates this entity is comprised of seven members appointed by the Westerville City Council, "who must either be an elector of the City or the owner of a business in the Architectural Review District." Westerville Codified Ordinance No. 1107.05(a). The powers and duties of the URB are to "[r]eview, approve or disapprove" the following: (1) "all proposed signage, landscaping, new construction, exterior remodeling or reconstruction proposed for all structures and premises within the Architectural Review District"; (2) "all requests for demolition of buildings, structures, site features or improvements within the Architectural Review District"; and (3) "all applications for signage within the Uptown District." Westerville Codified Ordinance No. 1107.05(d)(1), (2) and (3). The URB is also charged with the power to "[g]rant or deny applications for variances within the Uptown District from the provisions of the sign code," and to "[a]dopt by resolution criteria, rules and regulations consistent with the guidelines and purpose of Chapter 1149 for the purpose of

evaluating applications for certificates of appropriateness." Westerville Codified Ordinance No. 1107.05(d)(4) and (5).

{¶ 46} In the present case, the trial court held that WICC and the URB are the instrumentalities through which the city carries out its government functions, and thus entitled to immunity under R.C. 2744.02(A). In addressing appellant's claims against WICC and the URB, the trial court relied on the Supreme Court of Ohio's decision in *Wilson v. Stark Cty. Dept. of Human Servs.*, 70 Ohio St.3d 450 (1994).[2]

{¶ 47} In *Wilson*, the Supreme Court held in part that, while R.C. Chapter 2744 is silent as to whether county departments of human services are "themselves political subdivisions," they are nonetheless "instrumentalities through which the political subdivisions carry out governmental functions," and "[w]here a county is immune under R.C. 2744.02 in its operation of a human services department, that immunity extends to the human resources department itself." *Id*. at 452-53. The Supreme Court reasoned that "[t]he burdens imposed by litigation and damage awards ultimately fall upon the same county resources regardless of whether the nominal defendant is the county board of commissioners or the county department of human services." *Id*. at 453.

{¶ 48} As set forth above, the record evidence reflects that WICC consists of seven members, four of whom are representatives of the city. WICC performs functions on behalf of the city to promote the civic development of commercial property; one of those functions is to administer a grant program (designated as the Uptown Westerville Facade Improvement Program) providing grant funds for renovations to buildings in the city's Uptown District. The city provides funding for WICC, and applications made to WICC for grant money are contingent upon plan approval by URB, as well as building code approval by the city. WICC works in conjunction with URB regarding applications for grant money, i.e., if WICC "conditionally approves" an application, the property owner "must then have their individual plans approved by the [URB]." Grant funds provided by WICC "are contingent on building code approval." (Craven Aff. at ¶ 8, 10.)

---

[2] The trial court also addressed and found inapposite appellant's reliance on *Trucco Constr. Co.* noting that R.C. 2744.01(B) was amended in 1995 and changed the definition of "employee" of a political subdivision, substituting the words "acting within the scope of *his employment*" with "acting within the scope of *the officer's, agent's, employee's or servant's employment*." (Emphasis sic.) (Decision at 17.)

{¶ 49} The URB is an entity comprised of members appointed by city council to review and approve and/or disapprove applications with respect to construction in the city's historic Uptown District. As to the URB's interaction with appellant in the instant case, the evidence indicates appellant submitted various applications for certificates of appropriateness for work to be performed on the subject property, and the URB approved all (ten) of appellant's applications. As discussed above, applications for funding from WICC's Uptown Westerville Facade Improvement Program require applicants to obtain all necessary permits and to carry out improvements in accordance with the city's building code, codified ordinances, and the Uptown Westerville Design Guidelines. Applicants also acknowledge that completed facade improvements are subject to "inspection by the Westerville Industry and Commerce Corporation and the Uptown Review Board." (2015 Uptown Westerville Facade Improvement Program App. at 2.) As recognized by the trial court, the activities conducted by these entities, including the administration of a grant funding program to promote economic development (involving the discretionary power to award grant funds based on compliance with building codes and enforcement provisions of city ordinances) and the authority to issue certificates of appropriateness, arguably implicate governmental functions. *See, e.g., Lemley v. Cleveland*, 8th Dist. No. 97296, 2012-Ohio-1544, ¶ 28 ("the City's issuance of a Certificate of Appropriateness falls squarely within the contemplation of R.C. 2744.01(C)(2)(p), specifically, inspections in connection with * * * buildings or structures").

{¶ 50} Upon review of the record, including evidence regarding the activities of WICC and the URB carried out on behalf of the city to promote commercial development and enhance the city's historic Uptown District, we find no error with the trial court's determination that WICC and the URB serve the city as instrumentalities through which it carried out certain governmental functions and duties, and therefore the immunity afforded the city "extends" to those entities. *Wilson* at 453. *See also Miller Plumbing & Heating Co. v. Village of Chagrin Falls*, 8th Dist. No. 73592 (Dec. 10, 1998) (immunity extended to village under R.C. Chapter 2744 also extends to engineering consulting firm as "the instrumentality through which the Village carried out the governmental function"); *Lambert v. Clancy*, 125 Ohio St.3d 231, 2010-Ohio-1483, ¶ 20 ("the immunity granted by

statute to a political subdivision is also extended to the political subdivision's departments, agencies, and offices, which implement the duties of the political subdivision").

{¶ 51} We next address appellant's contention the trial court erred in granting summary judgment in favor of city employees Bitar and Ungar. Appellant argues the trial court failed to "explicitly address" whether the actions or omissions of Bitar and Ungar were outside the scope of their employment, as set forth under R.C. 2744.03(A)(6)(a), and that the court erred in failing to find evidence that acts or omissions of these employees were with malicious purpose, in bad faith, or wanton or reckless. (Appellant's Brief at 31.)

{¶ 52} With respect to Bitar, appellant asserts genuine issues of material fact remain as to whether he was reckless regarding the truth or falsity of his representations to her about the opportunity for grant funding, and that the trial court erred in ruling she failed to produce sufficient evidence of fraud and/or fraud in the inducement. Appellant further argues she presented sufficient evidence that Ungar tortuously interfered with the business relationship between her and Anna DiCarlo, and that ample evidence exists that both Bitar and Ungar committed the tort of intentional infliction of emotional distress.

{¶ 53} R.C. 2744.03(A)(6) "provides immunity to an employee of a political subdivision unless an exception found within R.C. 2744.03(A)(6)(a) through (c) applies." *Thompson v. Buckeye Joint Vocational School Dist.*, 5th Dist. No. 2015 AP 08 0047, 2016-Ohio-2804, ¶ 27. Under the provisions of R.C. 2744.03(A)(6), "an employee of a political subdivision is immune from liability unless: (1) the employee's acts or omissions are manifestly outside the scope of the employee's employment or official responsibilities; (2) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton and reckless manner; or (3) civil liability is expressly imposed on the employee by a section of the Revised Code." *Id.*

{¶ 54} Although R.C. Chapter 2744 "does not define the type of employee acts that fall 'manifestly outside the scope of employment or official responsibilities' under R.C 2744.03(A)(6)(a), * * * Ohio courts have generally drawn from agency-law principles to hold that 'conduct is within the scope of employment if it is initiated, in part, to further or promote the master's business.' " *Smith v. Pierce Twp.*, 12th Dist. No. CA2013-10-079, 2014-Ohio-3291, ¶ 35, quoting *Curry v. Blanchester*, 12th Dist. No. CA2009-08-010, 2010-Ohio-3368, ¶ 30, citing *Jackson v. McDonald*, 144 Ohio App.3d 301, 307 (5th Dist.2001).

Thus, " '[i]n the context of immunity, [a]n employee's wrongful act, even if it is unnecessary, unjustified, excessive or improper, does not automatically take the act manifestly outside the scope of employment.' "  (Internal quotations omitted.)  *Id.*, quoting *Curry* at ¶ 30.  Rather, " '[i]t is only where the acts of [political subdivision] employees are motivated by actual malice or other [situations] giving rise to punitive damages that their conduct may be outside the scope of their * * * employment.' "  *Id.*

{¶ 55} Under Ohio law, "[m]alice has been defined as the willful and intentional design to do injury."  *Wooton v. Vogele*, 147 Ohio App.3d 216, 222 (1st Dist.2001).  The term " '[b]ad faith' embraces more than bad judgment or negligence," as it "imports a 'dishonest purpose, moral obliquity, conscious wrong doing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud."  *Id.*  The Supreme Court "has defined 'wanton misconduct' as 'the failure to exercise *any* care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result.' " (Emphasis sic.)  *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, ¶ 8, quoting *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, paragraph three of the syllabus.  Wanton conduct involves "a degree greater than negligence," and "[t]he standard for showing wanton conduct is extremely high."  *Hiles v. Franklin Cty. Bd. of Commrs.*, 10th Dist. No. 05AP-253, 2006-Ohio-16, ¶ 39.

{¶ 56} The Supreme Court has "defined 'reckless conduct' as conduct 'characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct.' "  *Argabrite* at ¶ 8, quoting *Anderson* at paragraph four of the syllabus. While negligence " 'consists in mere inadvertence, incompetence, [or] unskillfulness,' " reckless misconduct " 'requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.' "  *Marchetti v. Kalish,* 53 Ohio St.3d 95, 100 (1990), fn.3, quoting Restatement of the Law, Torts 2d, 590, Section 500, Comment (g). The Supreme Court has held that "[d]istilled to its essence, and in the context of R.C. 2744.03(A)(6)(b), recklessness is a perverse disregard of a known risk."  *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, ¶ 73. Accordingly, as recklessness "requires something more than mere negligence," the actor, "[i]n fact, * * * 'must be conscious that his conduct will in all

probability result in injury.' " *Id.* at ¶ 74, quoting *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356 (1994).

{¶ 57} A court's grant of summary judgment in favor of an employee of a political subdivision "is proper where the employee's actions 'showed that he did not intend to cause any harm * * *, did not breach a known duty through an ulterior motive or ill will, [and] did not have a dishonest purpose.' " *Fox v. Daly,* 11th Dist. No. 96-T-5453 (Sept. 26, 1997), quoting *Hackathorn v. Preisse*, 104 Ohio App.3d 768, 772 (9th Dist.1995). Further, "[t]he standard for showing that a political subdivision employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner is 'rigorous' and 'will in most circumstances be difficult to establish.' " *Graf v. Nelsonville*, 4th Dist. No. 18CA28, 2019-Ohio-2386, ¶ 53, quoting *Argabrite* at ¶ 8.

{¶ 58} Under Ohio law, the elements of civil fraud are: "(1) a representation, (2) material to the transaction, (3) made falsely, knowingly, or recklessly, (4) with the intention of misleading another into a justifiable reliance on those facts, (5) that causes the other party injury." *Curran v. Vincent*, 175 Ohio App.3d 146, 2007-Ohio-3680, ¶ 18 (1st Dist.). The elements of a claim for tortuous interference with a business relationship are " '(1) a business relationship; (2) the tortfeasor's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom.' " *Walter v. ADT Sec. Sys.,* 10th Dist. No. 06AP-115, 2007-Ohio-3324, ¶ 31, quoting *Diamond Wine & Spirits v. Dayton Heidelberg Distrib. Co., Inc.*, 148 Ohio App.3d 596, 2002-Ohio-3932, ¶ 23 (3d Dist.). A plaintiff seeking to bring a claim for intentional infliction of emotional distress " 'must prove (1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress.' " *Weaver v. Deevers*, 11th Dist. No. 2020-P-0087, 2021-Ohio-3791, ¶ 33, quoting *Phung v. Waste Mgt., Inc.*, 71 Ohio St.3d 408, 410-11 (1994).

{¶ 59} Appellant initially contends the trial court failed to address whether the actions of Bitar and Ungar were outside the scope of their employment. Appellant focuses specifically on the actions of Bitar, asserting that he promised appellant she could obtain grant funding and still use the real estate for the commercial and residential purposes she expressed.

{¶ 60} As noted by appellees, appellant's contention that Bitar was not acting within the scope of his employment with the city stands in contrast to the allegations of her complaint. Specifically, in her amended complaint, appellant alleged that "[a]t all times relevant [appellees] were acting under the supervision, authority, apparent authority, direction and control of the City of Westerville and/or WICC and/or the [URB]." (Pl.'s Proposed Am. Compl. at ¶ 7.) The complaint further alleged that, prior to purchasing the property, appellees "through its/their agents/other City Officials or apparent agents under the direction and control of the [appellees] assured/promised [appellant] that if she purchased the property and worked on its restoration, certain historical restoration grants would be available to her should they be needed to help pay for the rehab of the home in question." (Pl.'s Proposed Am. Compl. at ¶ 14.)

{¶ 61} More significantly, we agree with appellees that the record evidence as to purported misrepresentations made by Bitar to appellant regarding the development of her property involve discussions made in his capacity as a zoning official. According to the deposition testimony of Bitar, in his role as city planning commissioner, he "oversees private development within the city," and also "[a]dminister[s] the zoning code." (Bitar Depo. at 7.) As part of those duties, Bitar acts as a "staff liaison" with respect to the URB and provides "recommendations to the board" regarding applications for approval of certificates of appropriateness. *(*Bitar Depo. at 26-27.)

{¶ 62} The record indicates that Bitar, in his capacity as planning commissioner, guided appellant through the URB application and review process, as reflected in e-mail exchanges between those individuals. Prior to a meeting of the URB on appellant's application, Bitar submitted a staff report to the URB outlining the requests by appellant for "approval of various exterior building and site improvements with an urgent focus on roof replacement." (Apr. 1, 2016 Staff Report at 1.) Appellant testified in her deposition that Bitar attended the URB meeting on the proposed project and made a presentation and a staff recommendation, and appellant acknowledged that Bitar recommended the URB approve her recommendations. The record also reflects that the URB ultimately approved the application, i.e., appellant received certificates of appropriateness for all ten of the exterior items she sought to complete.

{¶ 63} While appellant contends Bitar provided inaccurate information regarding the availability of funding and use of her property, the record does not raise a genuine issue of material fact as to whether Bitar acted manifestly outside the scope of his employment regarding discussions he had with appellant on issues of funding and compliance with building and zoning code requirements. Accordingly, while the focus of the trial court's analysis with respect to the conduct of Bitar was on the provisions of R.C. 2744.03(A)(6)(b), rather than 2744.03(A)(6)(a), based on this court's de novo review appellant cannot show prejudicial error by the trial court in failing to explicitly discuss that provision.

{¶ 64} Appellant further contends genuine issues of material fact remain as to whether the actions of Bitar and Ungar were malicious, in bad faith, or conducted in a wanton or reckless manner. With respect to Bitar, appellant maintains reasonable minds could conclude he mispresented and misled her into believing she could obtain WICC grant money to defray the cost of renovation of the commercial component of her mixed use purpose while still being able to maintain the residential use purpose. Appellant further contends reasonable minds could conclude that, according to Bitar's representations, the award of a WICC grant did not prohibit the owner from renovating the residential component of a project at her own expense. Appellant also maintains Bitar was aware of, and yet failed to disclose to her, several pitfalls "such as arduous building code requirements." (Appellant's Am. Brief at 25.) According to appellant, Bitar "was at the least reckless" in failing to discuss the viability of "potential uses and funding opportunities for development." (Appellant's Am. Brief at 25-26.)

{¶ 65} In considering the evidence on summary judgment as to alleged misrepresentations by Bitar, the trial court noted deposition testimony by Bitar "that one of his job duties was to make sure the development of properties in the City meet the requirements of its zoning code," and that Bitar "informed [appellant] that WICC funding was available for commercial and mixed uses and, as long as there was some commercial use of her [p]roperty, her project would be eligible for WICC funds." (Decision at 14.) The trial court found that Bitar met with appellant "and advised her as best he could about zoning and development in the Uptown District and about a potential funding source to offset the expense of the renovation." Further, once appellant purchased the property, "Bitar successfully guided her through the process for securing grant funds from WICC and

the approval of her renovations with the URB." After appellant "balked at complying with the commercial building code for the home, Bitar was involved in laying out the various options [appellant] had to move forward with her [p]roperty." The trial court concluded "[n]one of these actions were in bad faith or negligent, let alone fraudulent, malicious, willful, wanton or reckless." (Decision at 15.)

{¶ 66} In addressing appellant's specific claim for fraud, the trial court held that "none of the representations made by any of the Defendant[s] in this case were knowingly false." (Decision at 18.) Specifically, the trial court found it was "true that [appellant] could 'live-work' in the premises; she just could not convert the [p]roperty into a 'high-density residential' use"; it was "also true that [appellant's] mother could live with her in the [p]roperty; she just could not receive WICC funds if that happened"; similarly, it was "true that WICC funds might be available if [appellant] complied with the commercial code; she just could not use those funds for residential purposes"; and it was "also true that if [appellant] chose to receive WICC funds * * * she would have to modify her deed to restrict the use of the [p]roperty to commercial uses; she just could not use the [p]roperty for mixed-use purposes." (Decision at 18-19.)

{¶ 67} The record on summary judgment indicates Bitar met with appellant prior to her purchase of 30 East College Avenue and provided her information as to potential grant funding available for commercial renovations in the historic Uptown District. During her deposition, appellant, a licensed real estate broker, indicated she had been involved with three prior renovation projects, and acknowledged she was familiar with zoning codes. Appellant stated that she first met with Bitar in October 2015. Appellant "wanted to know if I could live, work, have my office in the front and my elderly mother in the back." According to appellant, Bitar informed her that she would have to contact the URB regarding "a historical renovation." (Appellant Depo. at 61-62.) Appellant testified that "right from the get-go after I told him how I wanted to use it and he said that the house does qualify but I'd have to go through - - for the money but I would have to go through the procedures, you know, I'd have to go through their hearing thing, and they were on vacation." (Appellant Depo. at 81.) Prior to closing, in December 2015, appellant did not speak with anyone from WICC or the URB.

{¶ 68} With respect to WICC grant funding, appellant understood that WICC provided conditional approval if the project fell within the parameters of the funding request. According to appellant, she "was told if I bought the house, that I could use it for all the reasons I wanted and I qualified for the funding and the money, no problem." (Appellant Depo. at 193.) She later came to understand that if she maintained an office and her mother lived in the house, she would not be eligible for WICC money. Appellant testified that, in February 2016, after purchasing the property, "I was told there was a mistake, but if I turned that back room that was supposed to be for my mother into a commercial property, then I could have the money, but that's not what I was told from the get-go." (Appellant Depo. at 64.) Bitar told her "they had made a mistake that I didn't qualify, my use didn't qualify for the money, so it changed * * * you know." (Appellant Depo. at 82.)

{¶ 69} Appellant could not remember whether she looked at the zoning code requirements for the Uptown District prior to purchasing the property, and she did not understand that WICC and the URB are separate entities, or that the URB did not approve funding. Appellant agreed that the condition of signing the deed restriction was a condition relating to funding (and not a condition as to her ability to use the property in the manner desired). Appellant understood that she could have moved forward with the project as a pure commercial use and that she would have received funding; she also agreed that no one from the city told her she would be in violation of the zoning code if she used the property as originally proposed.

{¶ 70} Appellant acknowledged that she received conditional approval from WICC for $27,053 in grant money, and that the URB subsequently approved all of her applications for certificates of appropriateness. Appellant declined, however, to sign a deed restriction regarding multi-family residential use "[b]ecause it was subject to their interpretations of things." (Appellant Depo. at 124-25.) Appellant "refused to restrict my deed. I did not take the money." (Appellant Depo. at 128.)

{¶ 71} According to the deposition testimony of Bitar, the Uptown District "is established in the zoning code as a mixed-use district." (Bitar Depo. at 13-14.) During his deposition, Bitar, who testified that he first met appellant in "late 2015," identified an exchange of e-mails involving correspondence he had with appellant beginning in

December 2015. (Bitar Depo. at 40.) In response to an e-mail inquiry by appellant regarding a roof leak, Bitar "suggested we meet early in January to discuss the process and the funding." (Bitar Depo. at 41.) Bitar "mentioned there is a chance she can get assistance through the Facade Improvement Program, which may help with the roof and other exterior improvements." (Bitar Depo. at 41-42.) He also told appellant "there is a process that has to be followed, so I think it would make sense to strategize to make sure the process moves as efficiently as possible," and Bitar "[s]uggested she talk to [city official] Dave Meadows to understand more about the provisions of the grant." Bitar informed appellant "the Uptown board approval has to happen before or prior to the work being done," and that "[t]here have been occasions where URB * * * required reversal of work that was done without their approval." (Bitar Depo. at 42.) In that correspondence, Bitar also suggested that appellant "talk to economic development to understand the provisions of the program." (Bitar Depo. at 42-43.)

{¶ 72} As noted, appellant contends that Bitar made representations that basically assured her, based on her proposed mixed use of property, that she would be eligible for grant funding to defray renovation costs. Appellant further maintains Bitar was aware of, yet failed to disclose, various pitfalls of the city's "arduous building code requirements." (Appellant's Brief at 25.)

{¶ 73} Accepting appellant's testimony that Bitar informed her of a mistake with respect to the availability of grant funding for her proposed renovations, the summary judgment evidence as to the issue of mistaken advice and/or interpretation of zoning requirements does not, as a matter of law, rise to the level of recklessness. Here, a review of the record as to the conduct of Bitar's interactions with appellant, including purported mistaken and/or bad advice, does not indicate Bitar was conscious that his conduct would in all probability result in injury, i.e., there was no "perverse disregard of a known risk." *O'Toole* at ¶ 73. As noted by the trial court, the evidence indicates that Bitar sought to assist appellant throughout the process, that he attended the URB meeting and recommended that her application be approved, and that appellant ultimately received approval for each of her requested certificates of appropriateness. While the evidence construed most strongly in favor of appellant might create a genuine issue of material fact as to whether Bitar was negligent in advising her about the grant program and/or the steps she needed to

take to comply with building requirements in order to obtain funding, we agree with the trial court that there is a lack of evidence upon which reasonable minds could find that Bitar acted with malicious purpose, in bad faith, or in a wanton or reckless manner. *See, e.g., Griggy v. Cuyahoga Falls*, 9th Dist. No. 227533, 2006-Ohio-252, ¶ 10 (city housing inspector's "mistake" in citation to the wrong city code did not rise to the level of wanton and reckless conduct).

{¶ 74} We note that appellant essentially alleges in part a fraud claim based on a purported assurance by Bitar that she would receive future grant funds, i.e., the alleged misrepresentation is promissory in nature. In general, "a claim for fraud cannot be predicated upon promises or representations relating to future actions or conduct." *Martin v. Ohio State Univ. Found.*, 139 Ohio App.3d 89, 98 (10th Dist.2000). An "exception to this rule" is when the individual making a promise of future action, " '*at the time he makes it*, has no intention of keeping his promise.' " (Emphasis sic.) *Id.*, quoting *Tibbs v. Natl. Homes Constr. Corp.*, 52 Ohio App.2d 281, 287 (12th Dist.1971). While appellant contends she relied on Bitar's authority, experience, and guidance to navigate the rules for renovation of her property, the record evidence does not create a genuine issue of material fact that Bitar assured her that she would receive funding when he, in fact, knew she would be unable to do so, or that he made representations with the intent to mislead her.

{¶ 75} We further note the record fails to demonstrate a genuine issue of material fact as to the justifiable reliance element for a fraud claim. While appellant contends Bitar failed to inform her of the arduous building code requirements, Ohio courts have "recognized that 'persons seeking information from the government must assume the risk that the agent of the government might be wrong.' " *Mueller v. Vandalia*, 2d Dist. No. 16158 (Mar. 7, 1997), quoting *Gaston v. Ohio Bur. of Emp. Serv.*, 17 Ohio App.3d 12, 14 (8th Dist.1983). Further, "[a]n individual has no right to rely on a representation when the actual facts are equally open to both parties." *Takis, LLC v. C.D. Morelock Properties, Inc.*, 180 Ohio App.3d 243, 2008-Ohio-6676, ¶ 30 (10th Dist.) (insufficient evidence to support fraudulent inducement claim where plaintiffs "produced no evidence suggesting they were prevented from independently inquiring into the zoning requirements" for proposed use of property). *Id.*

{¶ 76} Regarding appellant's allegations involving Ungar, the city's chief building official, appellant asserted before the trial court that Ungar's "conduct was 'malicious, willful, wanton and reckless' because (1) he told her steel beams would need to be installed on her [p]roperty, and (2) he made misstatements about 'facts to potential purchasers about the permitted use of [appellant's] real estate.' " The trial court found both arguments "disingenuous." (Decision at 15.)

{¶ 77} In addressing appellant's claims against Ungar, the trial court cited Ungar's deposition testimony that he informed appellant "she may have to hire a design professional to determine whether additional supports like steel beams would need to be installed to comply with the commercial building code." The trial court further noted appellant "never spoke to Ungar before she closed on the [p]roperty at issue," and that Ungar "made no representations" to appellant that the property "would or would not qualify for WICC funds." Thus, the court concluded, "any conversations Ungar had with [appellant] were *after* she purchased the [p]roperty and do not rise to the level of maliciousness, willful, wanton or reckless conduct, not to mention she could not have relied on them in any way." (Decision at 15.)

{¶ 78} Appellant's claim for tortious interference with a business relationship also alleged conduct by Ungar. Specifically, appellant asserted that Ungar interfered with her attempt to sell the property located at 27 East College Avenue (a property she purchased and sold after selling her property at 30 East College Avenue). In addressing this claim, the trial court noted that "this case is not about 27 E. College Avenue," and that if appellant had claims against appellees with respect "to that other property," her remedy "was to amend her complaint and make the allegations." (Decision at 20.) The trial court further noted that appellant's claim was based on the affidavit of Anna DiCarlo, who averred in part: " 'I am confident that Mr. Ungar most likely made the same kinds of statements to prospective buyers of 30 East College Avenue as he did to me regarding 27 East College Avenue.' " (Decision at 20, quoting DiCarlo Aff. at ¶ 22.) The trial court concluded that "this statement means nothing and is pure speculation." The trial court further held appellant "does not even identify who it was she had a business relationship with." (Decision at 20-21.)

{¶ 79} Upon review, we find no error with the trial court's determination. With respect to representations by Ungar regarding steel beams, appellant points to a statement

by Ungar that appellant would have to hire a design professional to determine whether she needed steel beams in order to comply with the Ohio Building Code. According to appellant, the evidence shows Ungar "already predetermined that steel beams were required to conform to the Building Code." (Appellant's Brief at 37.) We agree, however, with the trial court that, as a matter of law, the facts/evidence as to the actions alleged, i.e., Ungar's statement/opinion about hiring a design professional, simply do not rise to the level of malicious, willful, wanton or reckless conduct.

{¶ 80} We also find no error with the trial court's determination that appellant failed to submit evidence indicating Ungar knew of a business relationship with respect to appellant and the property at 30 East College Avenue, and/or that he intentionally interfered and caused termination of a relationship. As noted by the trial court, the evidence relied on by appellant involved the affidavit of Anna DiCarlo, who averred that she had an interest in purchasing the property at 27 East College Avenue, and that, because of representations made to her by Ungar, she chose not to pursue purchase of that property. That property, however, was not the subject of the instant action, and the record evidence is undisputed that the alleged statements occurred after appellant sold her property at 30 East College Avenue. During her deposition, appellant acknowledged that she sold the property at 30 East College Avenue prior to any interactions she had with DiCarlo. As found by the trial court, DiCarlo's averment in her affidavit that she was "confident" Ungar "most likely" made similar statements about the property at 30 East College Avenue is purely speculative and does not raise a genuine issue of material fact.

{¶ 81} In addressing appellant's claim for intentional infliction of emotional distress, the trial court found appellant failed to "identify any [p]sychologists or [p]sychiatrists that she visited; she does not present any diagnoses provided by any attending mental health expert; she does not indicate when or for how long she suffered this alleged distress; she does not provide any treatment regimen; nor does she provide any evidence of damages in this regard." (Decision at 21-22.) The record supports the trial court's findings, and we find no disputed facts as to whether appellees acted with malicious purpose, in bad faith, or in a wanton or reckless manner with respect to appellant's claim for intentional infliction of emotional distress.

{¶ 82} Finally, the trial court did not err in denying appellant's claim for promissory estoppel. Appellant's argument is premised on her assertion appellees were engaged in a proprietary function, and that WICC and the URB are not entitled to immunity as instrumentalities of the city. We have, however, addressed and rejected appellant's contentions with respect to those issues. Under Ohio law, "the doctrines of equitable estoppel and promissory estoppel are inapplicable against a political subdivision when the political subdivision is engaged in a governmental function." *Hortman v. Miamisburg*, 110 Ohio St.3d 194, 2006-Ohio-4251, ¶ 25. *See also Ohio Dept. of Jobs & Family Servs. v. Ohio Wilderness Boys Camp*, 7th Dist. No. 13 NO 403, 2015-Ohio-2331, ¶ 18, quoting *Halluer v. Emigh*, 81 Ohio App.3d 312, 318 (9th Dist.1992) ("it is well-settled law in Ohio that estoppel cannot be used against [a political subdivision] or [its] agents during the exercise of a government function" based on rationale that " '[m]istaken advice or opinions of a government agent do not create an estoppel' ").

{¶ 83} Based upon this court's de novo review of the record, the trial court did not err in granting summary judgment in favor of appellees. Accordingly, appellant's eight assignments of error are not well-taken and are overruled.

{¶ 84} Based upon the foregoing, and having overruled appellant's eight assignments of error, the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

KLATT and JAMISON, JJ., concur.

_____